## Reichle, Appellant, *v.* Reichle.

Argued April 24, 1929.

Before TREXLER, KELLER, GAWTHROP, CUNNINGHAM and BALDRIGE, JJ.

*W. T. Tredway,* for appellant.—Unjustifiable conduct which wounds mental feelings so as to endanger life, is ground for divorce: McMahen v. McMahen, 186 Pa. 485; Donnelly v. Donnelly, 76 Pa. Superior Ct. 92.

*G. K. Herrington,* of *Hartje & Herrington,* for appellee.—Indignities provoked by libellant are not grounds for divorce: Biddle v. Biddle, 50 Pa. Superior Ct. 30; Kwolek v. Kwolek, 83 Pa. Superior Ct. 499.

OPINION BY TREXLER, J., July 2, 1929:

The husband seeks a divorce from his wife, alleging cruel and barbarous treatment and indignities to the person. They were married June 29, 1920, and the libel in divorce was filed May 29, 1928. The husband testified that they were separated in June, 1928, presumably the filing of the libel and the separation occurred about the same time. There were numerous allegations contained in the bill of particulars, but the testimony which was produced is very short. The husband gives the origin of the trouble in these words, ''One word would bring on another and we fought concerning the youngsters, and I told her unless she ceased to holler at those children that I would apply for and get a divorce, and take them away from you, and she said before you will do that, she said, 'I will give you a slow dose.' ''

In March, 1926, he was putting up a gas range and the piping projected two inches out over the wall which was farther than she thought it ought to and she accused him of making it that way intentionally; one word brought on another and she applied a vulgar epithet to him, took a butcher knife and told him she would cut his heart out. He then took the knife from her and he had her arm across his knee and was going to break it, but he did not because he lost strength and she cried. She frequently told him that she would give him ''a slow dose'' and being in fear of his life, before he ate anything at the table, he would see to it that the children ate first. He thought she loved the children and she would have called them away from the table before they could partake of any poison food.

One night he ate and got very sick and the boy was sick. He vomited and so did the boy and this impaired his physical health and made him nervous. His wife kept things in a turmoil and he could not get down to satisfactory conditions. He was in fear of his life and lost weight from 155 pounds to 140 pounds. He, upon cross-examination, repeated the incident about the knife and it appears she grabbed the knife, but did not attack him, merely told him she would "cut his heart out."

Henry G. Sullivan, who roomed in their house about five months, told about the kitchen episode in regard to the stove and substantially gave the same account as the husband and also testified that she called him bad names, so much so that this man could not stand the language because he had a boy with him six years of age. He said that she took care of the house, took care of her children, did the washing, did her husband's mending and was a good wife, that her outbursts were those of temper and were brought about "by some kind of fight" and the husband talked back to her a little. The testimony of this witness was not calculated to impress the court who characterize his remarks as being "very strong." His protestations certainly did not improve his narrative.

The wife denies the occurrence in regard to her taking the butcher knife. She says she never did. She did use vile names to him, but that was merely paying him back in his own coin. They both did, she says. She learned the habit from him. She frankly admits that she told him she would give him a slow dose, but she never made that remark without provocation and always in retaliation to what he said. He told her he would kick her ribs in and pull her down steps and break her neck and she said if he did that, she would give him a slow dose. She says she never

attempted to poison him. It is true that on a certain occasion they were all sick and she says it came from eating salmon or kippered herring. The only threats she ever made him were in response to his threats.

It is singular that although there are twenty-three items in the libellant's bill of particulars which refer to matters which could have been proven by the testimony of witnesses, for they are alleged to have taken place in the presence of other people, there are only two of the items that were supported by testimony at the hearing, the one as to the butcher knife, which did not, according to the bill of particulars, have its origin in the putting up of the range, but occurred out of pure "hatred and cussedness;" and the other, the threats of poisoning. There was no explanation offered why this testimony was not forthcoming, at least none appears upon the printed record that the writer has before him.

We think the lower court properly sized up the situation. Both of these people were highstrung; both of them of emotional temperament and easily excited and as the court said manifestly mismated. If incompatibility were ground for divorce in Pennsylvania, the case should be decided in favor of the libellant. The court concluded that the libellant magnified the incidents and disagreements that are not uncommon to some marriages. His allegations of humiliation and embarrassment in the presence of his friends, although alleged, were not proven. The court states, "As for her threats of actual violence by the use of such expression as 'giving him a slow dose' and on one occasion of brandishing a knife and threatening to cut him, these isolated instances are obviously exagerated and throughout the testimony of libellant himself, the threats and indignities are indicated to be the result of his conclusions, rather than an actual condition."

234

It has been said it is impossible to frame a definition of cruelty that will have universal application and each case must be decided upon its own peculiar facts. We do not think the occasions narrated by the libellant and his witness and denied by his wife are so clearly proven or are of such moment as to justify a conclusion that his life has become burdensome and his condition intolerable. The situation was as much the result of his acts as of his wife's. It seems to have been a matter of give and take.

The decree of the lower court is affirmed; the appellant to pay the costs.